[Crim. No. 8948.    Second Dist., Div. Two.    Dec. 6, 1963.]

THE PEOPLE, Plaintiff and Appellant, v. JOHN GERALD COWMAN, Defendant and Respondent.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, Woodruff J. Deem, District Attorney, Edwin M. Osborne, Chief Criminal Deputy District Attorney, James H. Kovacs and Lyman R. Smith, Deputy District Attorneys, for Plaintiff and Appellant.

Robert J. Soares, under appointment by the District Court of Appeal, and Hathaway, Soares & Shaw for Defendant and Respondent.

HERNDON, J.—This appeal is taken by the People from the order of the superior court granting defendant's motion under section 995, Penal Code, to set aside the information theretofore filed against him. In accordance with the order of the municipal court holding defendant to answer after preliminary hearing, this information charged defendant with possession of a sawed-off shotgun in violation of section 12020 of the Penal Code.

The sole question presented by this appeal is whether the action of the police officers in stopping defendant's car, under the circumstances here presented, so violated defendant's constitutional rights that no search thereafter conducted could be deemed legal and that no evidence thereby obtained could be admitted. The evidence introduced at the preliminary hearing, other than the sawed-off shotgun itself, consisted of the uncontradicted testimony of one of the arresting officers. This evidence disclosed the following facts:

Officer Staniland, a detective with the Oxnard Police Department, and a fellow officer were proceeding southbound on Oxnard Boulevard at approximately 12:30 a.m. on November 18, 1962, in an unmarked police car, when they observed defendant's vehicle parked on Oxnard near the northwest corner of the intersection of Oxnard and Sixth Street in the City of Oxnard.

As they approached the vehicle, the officers noticed that it was occupied by three men who were looking across the street in the direction of the City Center Motel. Officer Staniland testified that as they passed the vehicle, the occupants "looked at us and their heads seemed to follow us as our vehicle passed theirs, and after we had passed them, the headlights went on; we then pulled in to the curb across the other side of Sixth Street."

The officers continued to observe defendant's car and saw the headlights "go out again"; the three occupants again appeared to direct their attention toward the area of the

motel. After approximately five minutes, defendant's vehicle left the scene and made a right turn on Sixth Street. The officers turned their car around and saw defendant turn left, off Sixth Street, into B Street. The officers turned on their red light and defendant stopped his car in the 800 block on B Street. There is no indication that defendant's car had been driven otherwise than in a legal manner during this period.

As the officer approached defendant's car on foot, the occupant of the rear seat was drinking beer out of a beer bottle. This person turned his head toward the officers and then put the bottle down on the floorboard. Defendant got out of the car as the officers approached, but the other occupants remained seated therein. All three were asked to identify themselves. They showed various papers and stated that they were all from Los Angeles or Long Beach, had just been driving around and had been in Oxnard for about an hour. Defendant, who was driving the car and admitted ownership, was asked if the officers might search the car. He answered, "I don't care. Go ahead."

The officers proceeded to search the car and in addition to two open beer bottles found lying on the floor behind the front seat, they discovered five shotgun shells in the glove compartment and a sawed-off shotgun hidden in the ventilator shaft under the dashboard. This gun was not visible from outside the car, nor from the vantage point of a person seated in a normal fashion on the front seat. On the basis of these facts, the committing magistrate held defendant to answer.[1]

It is manifest, of course, that prior to the time defendant's vehicle was stopped, the officers had no probable cause either to arrest the occupants or to search the vehicle. Appellant does not contend otherwise. (*People* v. *Mickelson,* 59 Cal.2d 448, 454 [30 Cal.Rptr. 18, 380 P.2d 658]; *People* v. *Gale,* 46 Cal.2d 253, 257 [294 P.2d 13].) However, there is nothing whatsoever in the record to indicate that the officers' initial purpose in stopping the vehicle was to effect an arrest or to conduct a search thereof. We are presented therefore, with a very narrow question, i.e., whether the mere stopping of the vehicle under the circumstances described constituted such an unreasonable invasion of defendant's rights that all the subsequent acts and discoveries of the officers must be con-

---

[1]The other occupants of the car were released for the reason that the magistrate considered the showing insufficient as to them. The propriety of this determination is not before us, and we express no opinion thereon.

demned and rejected as the "fruits of a poisonous tree." It is our opinion that this determinative question must be answered in the negative; we think that both controlling precedent and common sense dictate this answer.

In *People v. Mickelson, supra* (at pp. 449-452), it was held that the prevailing California rule that persons may be interrogated and vehicles stopped for purposes of investigation upon facts "short of probable cause to make an arrest" had not been nullified by recent decisions of the United States Supreme Court. It was therein determined that, insofar as the federal rules in this regard may differ from those of this state, such difference is not predicated upon any constitutional ground and, hence, that we are not prohibited from adhering to other reasonable rules previously developed. In addition, as the court in *Mickelson, supra,* was careful to point out (p. 452):

"The United States Supreme Court apparently concluded that *the situations presented* in the *Henry, Rios,* and *Brinegar*[2] cases *allowed no middle ground* (see dissenting opinion of Jackson, J., in *Brinegar v. United States,* 338 U.S. 160, 183 [69 S.Ct. 1302, 93 L.Ed. 1879, 1894]), and hence that the officers were not justified in stopping the defendants' automobiles unless they had probable cause to make arrests." (Italics added.)

The importance of this observation is made clear when "the situations presented" in those cases are considered, particularly in the light of the dissenting opinion of Mr. Justice Jackson cited by our Supreme Court as the basis for its quoted statement. In the *Brinegar* case, federal officers, acting upon their observations of the known defendant's car and upon information which they had acquired previously, pursued and stopped the defendant because they believed that he was importing liquor into Oklahoma illegally.

The majority of the court, on the assumption that the officers there intended to search the car from the outset and had adequate facts prior to stopping it to warrant such a search, were not required to discuss the question whether the officers might not have been justified in stopping the car on the basis of some lesser quantum of evidence for purposes of interrogating the driver, but with no right to conduct a search thereof.

[2]*Henry v. United States,* 361 U.S. 98 [80 S.Ct. 168, 4 L.Ed.2d 134]; *Rios v. United States,* 364 U.S. 253 [80 S.Ct. 1431, 4 L.Ed.2d 1688]; *Brinegar v. United States,* 338 U.S. 160 [69 S.Ct. 1302, 93 L.Ed. 1879].

Mr. Justice Burton, however, in his separate concurring opinion, noted that it was not necessary to establish probable cause for the search prior to the colloquy which followed after the car was stopped. He stated (338 U.S. 178 [93 L.Ed. at page 1892]) : "The earlier events, recited in the opinion of the Court, discloses *at least ample grounds to justify the chase and official interrogation of the petitioner by the government agents in the manner adopted.*"[3]  (Italics added.)

However, it is in the dissenting opinion of Mr. Justice Jackson, joined in by Justices Frankfurter and Murphy, that the particular situation there presented is brought sharply into focus. It is there pointed out (p. 188 [93 L.Ed. at p. 1897]) : "*That [the officers] intended to set out on a search is unquestioned,* and there seems no reason to doubt that in their own minds they thought there was cause and right to search." (Italics added.)  Based upon this premise, that it was the initial intent of the officers to conduct a search and not merely to interrogate the driver, these dissenting justices felt probable cause had not been shown.

But the opinion continues, "I do not, of course, contend that officials may never stop a car on the highway without the halting being considered an arrest or a search. Regulations of traffic, *identification where proper,* traffic census, quarantine regulations, and *many other causes* give occasion to stop cars in circumstances which do not imply arrest or charge of crime. And to trail or pursue a suspected car to its destination, to observe it and keep it under surveillance, is not in itself an arrest nor a search. But when a car is forced off the road, summoned to stop by a siren, and brought to a halt *under such circumstances as are here disclosed,* we think the officers are then in the position of one who has entered a home: the search at its commencement must be valid and cannot be saved by what it turns up. [Citations.]" (Italics added.)

Similarly, in *Henry* v. *United States, supra,* 361 U.S. 98, 103 [4 L.Ed.2d 134, 139], the majority of the court which

[3]In closing his opinion, Mr. Justice Burton also aptly noted (pp. 179-180 [93 L.Ed. at pp. 1892-1893]) that, "Government agents have *duties of crime prevention and crime detection* as well as the duty of arresting offenders caught in the commission of a crime . . . The performance of the first duties are as important as the performance of the last. In this case the performance of the first halted the commission of the crime and also resulted in the arrest of the offender." (Italics added.)

held the arrest and search of the defendant's automobile to have been illegal, were at pains to note: "The prosecution conceded below, and adheres to the concession here, that *the arrest took place when the federal agents stopped the car.* That is our view on the facts *of this particular case.* When the officers interrupted the two men and restricted their liberty of movement, the arrest, *for purposes of this case,* was complete. It is, therefore, necessary to determine whether at or before that time they had reasonable cause to believe that a crime had been committed. The fact that afterwards contraband was discovered is not enough. An arrest is not justified by what the subsequent search discloses . . .[citation]. . . ." (Italics added.)

The importance of this restricted interpretation is emphasized by the footnote thereto in which it is noted that "An alternative theory that the arrest took place at a subsequent time was discussed by the Government only to make clear that it would press that position on the facts of another case now pending here, No. 52, *Rios* v. *United States.*" However, Mr. Justice Clark, in a dissenting opinion joined in by Chief Justice Warren, refused to accept this interpretation, and stated as follows (pp. 104-105 [4 L.Ed. 2d at pp. 139-140]):

"While the Government, unnecessarily it seems to me, conceded that the arrest was made at the time the car was stopped, this Court is not bound by the Government's mistakes." In a footnote thereto is the following added comment: "It may be that the Government is doing some wishful thinking in regard to the relaxation of the standards incident to the 'probable cause' requirement by making this a test case. We should not lend ourselves to such indulgence."

After refusing to accept the government's concession and the interpretation of the facts which seemed to require it, Mr. Justice Clark continued (p. 106 [4 L.Ed.2d at p. 141]): "In my view, the time at which the agents were required to have reasonable grounds to believe that petitioner was committing a felony was when they began the search of the automobile, which was after they had seen the cartons with interstate labels in the car. The earlier events certainly disclosed ample grounds to justify the following of the car, the subsequent stopping thereof, and the questioning of petitioner by the agents. This interrogation, together with the sighting of the cartons and the labels, gave the agents indisputable probable cause for the search and arrest.

"When an investigation proceeds to the point where an

agent has reasonable grounds to believe that an offense is being committed in his presence, he is obligated to proceed to make such searches, seizures, and arrests as the circumstances require. It is only by such alertness that crime is discovered, interrupted, prevented, and punished. We should not place additional burdens on law enforcement agencies.''

Thus, it is clear that the majority opinion in *Brinegar* and *Henry, supra,* did not reach the question as to what constitutes reasonable cause to stop an automobile for purposes of investigation where there is no preconceived intent either to arrest the occupants or to conduct a search thereof. This is so because, in each of these cases, either the peculiar facts or the concessions of the government indicated that such an intent had been present from the outset. As we have indicated, this issue was squarely presented only in *Rios* v. *United States, supra,* 364 U.S. 253 [80 S.Ct. 1431, 4 L.Ed.2d 1688]. Four justices dissented in the *Rios* case, but not upon the issue here under consideration. The majority opinion answered the instant question in the following language (pp. 261-262 [4 L.Ed.2d at p. 1694]) :

''If, therefore, the arrest occurred when the officers took their positions at the doors of the taxicab, then nothing that happened thereafter could make the arrest lawful, or justify a search as its incident. [Citations, including *Henry* v. *United States, supra.*] But the Government argues that the policemen approached the standing taxi only for *the purpose of routine interrogation,* and *that they had no intent to detain the petitioner beyond the momentary requirements of such a mission.* If the petitioner thereafter *voluntarily* revealed the package of narcotics to the officers' view, a lawful arrest could then have been supported by their reasonable cause to believe that a felony was being committed in their presence. The validity of the search thus turns upon the narrow question of when the arrest occurred, and the answer to that question depends upon an evaluation of the conflicting testimony of those who were there that night.'' (Italics added.)

The officers in the *Rios* case had been following the taxi for some distance, but they approached it while it was stopped only momentarily by a traffic light. This aspect would not appear to be of controlling importance, since the ''momentary detention'' of the suspect ordinarily would be of the same duration in either instance.

Certainly it would be a most anomalous rule that would

permit officers to follow a suspect until he is stopped by a traffic signal or some other circumstance inherent in city driving, and then be allowed to detain him, but which would prohibit the officers, under the same set of circumstances, from ordering him to stop.

Therefore, under the federal rule enunciated in *Rios, supra,* and under the preexisting California rule affirmed in *Mickelson, supra,* we hold that the conduct of the officers in stopping the defendant's automobile constituted neither an improper invasion of his right of privacy nor a violation of any of his constitutional rights. ▪ As noted in *Mickelson, supra,* our rule permitting temporary detention for questioning "strikes a balance between a person's interest in immunity from police interference and the community's interest in law enforcement. It wards off pressure to equate reasonable cause to investigate with reasonable cause to arrest, thus protecting the innocent from the risk of arrest when no more than reasonable investigation is justified."

▪ Of course, as this court recently noted in *Hood* v. *Superior Court,* 220 Cal.App.2d 242, 245 [33 Cal.Rptr. 782]: "[E]ven though the circumstances authorized such 'temporary detentions' may be 'short of probable cause to make an arrest' [citation] nevertheless there must exist *some* suspicious or unusual circumstance to authorize even this limited invasion of a citizen's privacy. Since the prosecution here chose not to rely upon the information they claim to have received from certain unknown parties prior to the surveillance, it is difficult to perceive on what basis they determined to stop a third person's vehicle that was being driven in a completely normal fashion."

In the *Hood* case we were not called upon to make a determination of this question (p. 247), because there the occupant was arrested and the vehicle was searched immediately upon its being stopped, conduct for which there was no semblance of probable cause and to which no consent had been given.

In the California cases there have been considered a great variety of factual situations which have been deemed sufficient to authorize investigations similar to that here in question. Among those cited in the *Mickelson* case are *People* v. *Martin,* 46 Cal.2d 106, 108 [293 P.2d 52] (two men in a parked automobile on a lover's lane at night); *People* v. *Blodgett,* 46 Cal.2d 114, 116-117 [293 P.2d 57] (several parties entering the same double parked taxi at 3 a.m.); *People* v. *Beverly,* 200 Cal.App.2d 119, 122 [19 Cal.Rptr. 67] (officer

testified that his attention was attracted to the car because "'it was kind of unusual for a car to be coming out of that area at that time . . . all of the auto wreckers at that time is usually closed.'"); *People* v. *Anushevitz*, 183 Cal.App.2d 752, 753 [6 Cal.Rptr. 785] (automobile having no registration displayed); *People* v. *King*, 175 Cal.App.2d 386, 388 [346 P.2d 235] (car similar to one reportedly used in a robbery). See also *People* v. *Porter*, 196 Cal.App.2d 684, 685-686 [16 Cal.Rptr. 886], where police stopped car after noticing it twice on the same street about 3 a.m., once occupied only by the driver and later by two men.

In the *Rios* decision (*Rios* v. *United States, supra*, 364 U.S. 253, 255-256 [80 S.Ct. 1431, 4 L.Ed.2d 1688, 1690-1691]) the facts are stated as follows: "At about ten o'clock on the night of February 18, 1957, two Los Angeles police officers, dressed in plain clothes and riding in an unmarked car, observed a taxicab standing in a parking lot next to an apartment house at the corner of First and Flower Streets in Los Angeles. The neighborhood had a reputation for 'narcotics activity.' The officers saw the petitioner look up and down the street, walk across the lot, and get into the cab. Neither officer had ever before seen the petitioner, and neither of them had any idea of his identity. Except for the reputation of the neighborhood, neither officer had received information of any kind to suggest that someone might be engaged in criminal activity at that time and place. They were not searching for a participant in any previous crime. They were in possession of no arrest or search warrants." Nevertheless, as indicated, the United States Supreme Court held that it could have been proper to detain the suspect under such circumstances for purpose of "routine interrogation."

█ The rationale of all these decisions is that an officer of the law, employed to maintain the peace and to prevent crime, as well as to apprehend criminals after the fact, has both the right and the duty to make reasonable investigation of all suspicious activities even though the nature thereof may fall short of grounds sufficient to justify an arrest or a search of the persons or the effects of the suspects. Experienced police officers naturally develop an ability to perceive the unusual and suspicious which is of enormous value in the difficult task of protecting the security and safety of law-abiding citizens. The benefit thereof should not be lost because the cold record before a reviewing court does not contain all the par-

ticularized perceptions which may have been so meaningful at the scene.

In the instant case, the officers observed three men looking in the direction of a motel from a car parked across the street under circumstances reasonably calculated to excite suspicion. And when the occupants of the vehicle, after having observed the passing car and after turning on their headlights as if in preparation to leave the area, or perhaps to enter the motel grounds, did neither but continued to sit in the car and watch the motel for an additional five minutes, it appears to us most reasonable for the officers to stop them for "routine questioning." As we have indicated, there is nothing whatsoever in the instant record tending to indicate any other or further intent on the part of the officers.

During the oral arguments counsel for respondent urged that nothing occurring after the stopping of the car could have served to increase the suspicions of the officers. However, when the officers approached the car, after it had stopped, they observed the occupant in the rear seat drinking out of a beer bottle. It would seem that this observation would have been sufficient to justify the arrest of the driver of the vehicle and the party drinking the beer as well as a search of the vehicle. (Veh. Code, §§ 23121, 23122 and 23123.) Certainly it gave the officers sufficient reason to request permission of the owner-driver to search the car. The committing magistrate impliedly found, and the superior court trial judge expressly found, that the defendant voluntarily consented to this search. Certainly there is nothing in the record to suggest anything to the contrary.

In view of our determination that the initial stopping of the automobile was reasonable and proper in this instance, we do not reach the question whether, in the case of an *improper* stopping, the officers would be precluded from acting upon subsequent observations revealing the commission of a crime or upon a subsequent consent to search voluntarily given. (Cf. *People* v. *Haven,* 59 Cal.2d 713, 718 [31 Cal.Rptr. 47, 381 P.2d 927].)

The order under review is reversed and the cause is remanded for further proceedings.

Fox, P. J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied January 29, 1964.