[Crim. No. 12310.    Second Dist., Div. Two.    Aug. 29, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. JACK ARTHUR HENZE, JR., et al., Defendants and Appellants.

Luke McKissack and Sam Major for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas A. Freiberg, Jr., for Plaintiff and Respondent.

FLEMING, J.—Burglary.

The questions at issue are the validity of the detention, search, and arrest of the defendants at the time of their apprehension.

The facts of their arrest are these: about 2:30 p.m. on February 24, 1965, two police officers at a distance of 220 feet saw the defendants, whom they did not know, seated on the grass in a public park. Officer Satterlee testified they appeared to be dividing objects which shone in the sunlight. Officer Turman observed the defendants through binoculars and testified they appeared to be counting coins and passing them back and forth. He could not actually see coins, but when one of the defendants got up Officer Turman saw him put what appeared to be a roll of coins in his pocket. The defendants then walked to a parked car and drove off, driving in a normal fashion and observing the traffic laws. The police officers followed in a patrol car, then drove alongside the defendants, identified

themselves, and ordered the defendants to stop their vehicle. At that time Hulten leaned forward and appeared to put something under the front seat, and Henze drove the car about 300 feet before stopping.

The defendants were ordered out of the car and searched for weapons, and in the search the police found a bottle of red capsules in Hulten's pocket. The defendants were then arrested for violation of the narcotic laws, and a further search of their persons and their automobile uncovered a quantity of small change and miscellaneous property, later identified as the proceeds of the burglary for which the defendants were here charged and convicted. The red capsules were sleeping pills which had been stolen in the same burglary.

The charge of burglary was amply proved. Nor do we question the validity of the search for weapons and the subsequent arrest of the defendants, if their initial detention was authorized. (*People* v. *Mickelson*, 59 Cal.2d 448, 450, 454 [30 Cal. Rptr. 18, 380 P.2d 658].) The key issue is whether there was a sufficient basis to justify the temporary detention of the defendants at the time they were caught.

█ Circumstances short of probable cause for an arrest may justify temporary detention of a person by a peace officer for investigation and questioning. (*People* v. *Michelson*, 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658]; *People* v. *Martin*, 46 Cal.2d 106, 108 [293 P.2d 52].) While the circumstances which will justify temporary detention have not been articulated with precision, still from the cases we have acquired a rough picture of the situations in which such a detention is warranted. First, there must be a rational suspicion by the peace officer that some activity out of the ordinary is or has taken place. Next, some indication to connect the person under suspicion with the unusual activity. Finally, some suggestion that the activity is related to crime.[1]

█ Although we find sufficient indications in this case that the defendants were engaged in some unusual activity, we do not find sufficient suggestion in the record that their unusual activity was related to crime. In order to justify

---

[1]Tentative Draft No. 1, American Law Institute, Model Code of Pre-Arraignment Procedure, has proposed the following rule.

"2.02(2) Stopping of Persons in Suspicious Circumstances. A law enforcement officer lawfully present in any place may, if a person is observed in circumstances which suggest that he has committed or is about to commit a felony or misdemeanor, and such action is reasonably necessary to enable the officer to determine the lawfulness of that person's conduct, order that person to remain in or near such place in the officer's presence for a period of not more than twenty minutes."

temporary detention for investigation and questioning, a somewhat more positive showing of a rational suspicion of criminal activity is required than the one disclosed in the present record. The added showing need amount to very little more than what we already have. For example, if this incident had taken place during the hours of darkness, its timing alone would have provided a sufficient extra factor to justify temporary detention for investigation. The law in many instances draws a sharp distinction between the controls which may be exercised by peace officers during the nighttime and those to which they are limited during daylight hours, and most of the cases upholding temporary detention for investigation and questioning have arisen out of incidents which occurred at night.[2] (*People* v. *Mickelson*, 59 Cal.2d 448 [30 Cal.Rptr. 18, 380 P.2d 658] ; *People* v. *Martin*, 46 Cal.2d 106 [293 P.2d 52] ; *People* v. *Blodgett*, 46 Cal.2d 114 [293 P.2d 57].)

Yet nighttime activity is not an element which is essential to the validity of temporary detention. Other factors may combine with those set forth in the present record to provide a sufficient basis for temporary detention :

Had the officers had a report of a current burglary, that factor might have furnished sufficient added suspicion to justify detention. (*People* v. *Mickelson*, 59 Cal.2d 448 [30 Cal. Rptr. 18, 380 P.2d 658] ; *People* v. *Gibson*, 220 Cal.App.2d 15, 20-21 [33 Cal.Rptr. 775].) But here the officers had no knowledge of the particular burglary, either at the time of their original observations or at the time of the detention.

Had the park where the police observed the defendants been known as a place where crimes, such as the sale of narcotics, had frequently and currently taken place, this might have provided sufficient justification for the detention (*People* v. *McGlory*, 226 Cal.App.2d 762, 764 [38 Cal.Rptr. 373].)

Had the police received information that criminal activity was scheduled to take place in the park of a type consistent with what the suspects were seen doing, this might have justi-

[2]Curfews and restrictions on nighttime activity have antecedents going back in English law to the 13th century. The Statute of Winchester 1285, 13 Edw. 1, c. 4, established the original Night Watch, under which persons so appointed were instructed to arrest any strangers until morning.

The present statute in Massachusetts authorizing nighttime investigation by the police can be traced to a Night Watch statute first passed in 1636.

Further discussion may be found in American Law Institute, Model Code of Pre-Arraignment Procedure, Tentative Draft No. 1, pp. 92-94, 222.

fied the detention. (*People* v. *Martinez*, 228 Cal.App.2d 739 [39 Cal.Rptr. 839].)

Had these officers known of a rash of recent petty burglaries in the neighborhood, this too might have provided the necessary additive to justify temporary detention. (*People* v. *McClain*, 209 Cal.App.2d 224 [26 Cal.Rptr. 244].)

Had the officers known that one of the defendants had previously been convicted of burglary, which in fact he had, this might have provided sufficient reason for the detention. (*People* v. *Perez*, 243 Cal.App.2d 528, 530 [52 Cal.Rptr. 514].)

Had the defendants been observed driving their car in an erratic or suspicious fashion, this might have provided sufficient justification for stopping them. (*People* v. *Anguiano*, 198 Cal.App.2d 426 [18 Cal.Rptr. 132] ; *Wilson* v. *Porter* (9th Cir. 1966) 361 F.2d 412.)

Had the defendants been seen sitting in a parked car at an unusual time and place, this might have justified their detention. (*People* v. *Martin*, 46 Cal.2d 106, 108 [293 P.2d 52] ; *People* v. *Cowman*, 223 Cal.App.2d 109, 118 [35 Cal.Rptr. 528].)

Had the defendants given the officers cause to believe they were violating the motor vehicle laws, this, too, would have justified their detention for investigation. (Veh. Code, § 2804.)

If any one of these factors had been added to the circumstances of the present case, then perhaps a rational suspicion of crime sufficient to justify temporary detention would have been established. But, as the case has been brought to us, none of these supplemental factors were involved, and justification for the defendants' detention does not appear to have been adequately established in the record. The case for detention boils down to the fact that the police saw two unknown men seated on the grass in a public park at 2:30 p.m. handling objects which shone in the sun. While this conduct qualified as unusual activity, we think the police acted prematurely in detaining the defendants without further information to fortify their initially aroused suspicions and to link this unusual activity in some fashion with crime. Accordingly, on the present record the evidence obtained as a result of the detention falls within the classification of improperly obtained evidence which should have been denied admission. (*People* v. *Chan*, 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513].)

The other justification relied upon to support the detention was that both defendants were on probation from pre-

vious convictions and therefore subject to arrest without warrant by any police officer. (Pen. Code, § 1203.2). The People argue that since the defendants were subject to arrest by any police officer, a fortiori they were subject to the lesser restraint of temporary detention. The argument is good, but it does not apply. It is inapplicable because the police officers at the time of detention did not know that defendants were probationers. If an arresting officer has no knowledge of the status of the person arrested that status cannot validate an arrest without probable cause. (*People* v. *Gallegos*, 62 Cal.2d 176, 178 [41 Cal.Rptr. 590, 397 P.2d 174].) The principle is comparable to the one that a search cannot be justified by what it later turns up. (*People* v. *Brown*, 45 Cal.2d 640 [290 P.2d 528].) Since the police officers in the present case did not know the two suspects were probationers, they were required to have a rational suspicion of criminal activity in order to temporarily detain.

We conclude that the burglary convictions must be reversed for prejudicial error in the admission of evidence. We reach this conclusion reluctantly, in the face of alert and vigilant activity by the police which resulted in the arrest of two burglars caught red-handed while still in possession of their loot. It is a melancholy fact that only a fraction of all burglary cases are ever solved, even nominally.[3] But to preserve the balance between the investigative activity of the police and the freedom of individuals to circulate in public places during daylight hours, a somewhat stronger suspicion of criminal activity is required to justify temporary detention than that presented here. We realize that this case was submitted on the transcript of the preliminary hearing and that proof of the circumstances leading to detention was fragmentary. Accordingly, although we reverse the judgment for the improper admission of evidence, on retrial the People can again offer the same evidence, and if they present a stronger basis for its admission, the evidence may be properly received by the court. We think it more probable than not that there was some good reason why the police were observing with binoculars two men in a public park at 2:30 in the afternoon, a reason which, if properly developed on retrial, might provide sufficient rational suspicion of criminal activity to justify the detention which took place.

---

[3] In California the percentage of burglaries reported cleared in 1965 was 21.7. (1965 Crime and Delinquency in California, p. 40.)

Part of the detriment suffered by Henze as a result of his conviction was the revocation of his probation on his prior conviction for burglary. While our judgment vacates this revocation, it is possible that sufficient cause for revocation of probation under the earlier conviction exists apart from the conviction in this case, and the trial court is free to again revoke or modify probation in the earlier case if the situation so warrants. (Pen. Code, § 1203.2.)

The same is true with respect to Hulten.

The judgments are reversed.

Roth, P. J., concurred.

HERNDON, J.—I dissent.

I agree with the trial judge and with the Attorney General that the police action taken by the officers in this case was reasonable and legal in all respects and deserves commendation rather than disapproval.

In my opinion, the effect of the present decision is to impose an unrealistic and unnecessary limitation upon the proper investigative powers of the police—an inhibition which will operate only to impair the effectiveness of our police officers in the conduct of their battle against the common enemy.

A reasonable and realistic application of the salutary rules of law enunciated in *People* v. *Martin*, 46 Cal.2d 106, 108 [293 P.2d 52], and *People* v. *Mickelson*, 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658], would result in the affirmance of this judgment convicting two unquestionably guilty defendants.

It seems to me that this is no time to hinder crime detection by the imposition of a rule forbidding a demonstrably effective police procedure—a procedure to which every law-abiding citizen should willingly submit under any reasonable set of circumstances.

I heartily agree with the following comments made by my Brother Fleming in a recent opinion wherein he emphasized the duty of the citizen willingly to identify himself and to explain his actions under any circumstances reasonably justifying inquiry by an officer:

"This duty to identify and account I find substantially similar to the duty of a motorist on the highway to identify himself and establish his right to be on the highway, to demonstrate his condition to exercise that right safely, and to report accidents involving property damage, personal injury,

or death. (Veh. Code, §§ 2804, 12951, 20002, 20003, 20004, 40302, subd. (a).) It is comparable to the duty to identify and account which we fulfill at the demand of the building superintendent when we enter our offices late at night, which we satisfy at the demand of customs and immigration inspectors when we return from overseas, which we carry out at the demand of the Director of Internal Revenue when we file our income tax returns. These inquisitions, oral and written, sometimes inconvenient, sometimes vexing, are part of the price we pay to insure domestic tranquility and promote the general welfare."[1]

Consistent with the philosophy expressed in the foregoing quotation, I submit that only a guilty person or an unreasonably petulant or hypersensitive individual would resent the actions of a police officer in detaining him and asking him to explain his actions under any set of conditions comparable to those which the officers had observed when they decided that they should question these appellants.

Subsequent events, of course, demonstrated the guilt of these culprits and proved that the suspicions of the officers were well-founded. However, I do not resort to the benefits of hindsight or to the subsequently established guilt of the appellants in arguing that the actions taken by the officers in this case were reasonable and proper.

If the officers in this case had been inhibited by some prophetic anticipation of the instant decision, they would have felt obliged to ignore the "unusual" money-dividing activities which they had observed, and which had excited their suspicions. As the result of the application of this inhibiting rule, the burglary of the Truman home would have remained another of the constantly increasing number of unsolved crimes of which residential burglaries are such a substantial and distressing part.

It is a matter of common knowledge of which we should take judicial notice, and a relevant fact of which the police officers most certainly were keenly aware at the time they observed these defendants, that coin-machine burglaries, and burglaries of residences in which collections of coins are stolen, are notoriously prevalent throughout the entirety of Los Angeles County.

To hold as a matter of law that the evidence in this record

---

[1] *People* v. *Weger*, 251 Cal.App.2d 584, 604-605 [59 Cal.Rptr. 661].

does not support the trial court's factual finding that the police officers had reasonable cause to stop these two "young adults" for routine questioning is to set a precedent which I regard as contrary to the public interest and one not required by any controlling decision or provision of law.

A brief restatement of the facts may aid in the development of a more realistic picture of this case as it appeared to the trial court.

The San Pedro residence of Robert and Betty Truman was entered and burglarized during the morning or early afternoon of February 24, 1965. The crime was committed at a time when Mr. and Mrs. Truman and their five school-age children were away from home.

Among numerous other items of personal property such as silverware, the burglars stole the collections of currency and coins which the Truman children had saved. The coins included loose quarters and 50-cent pieces, several rolls of nickels and dimes, and over $5 worth of pennies.

On the same day at about 2:30 in the afternoon Police Officers Satterlee and Turman, while on patrol duty, observed the defendants sitting on the grass in a small public park "facing each other and they appeared to be dividing some objects which were shining in the sunlight." After Officer Satterlee had made this observation, Officer Turman, who was looking at the defendants through binoculars, remarked, "It looks like they are counting money." Shortly thereafter defendants arose and Officer Satterlee saw defendant Hulten place in his pocket what appeared to be a roll of coins.

The defendants then walked to their car which was parked only a short distance away on a street other than the one on which the officers' car had stopped during the observation period.

Apparently this was the same vehicle which one of the neighbors of the burglary victims had described as "an old gray, dull black car" which "needed a paint job." With Henze driving and Hulten seated on his right, defendants drove away. The officers followed in their patrol car, drove alongside the defendants' car and signaled them to stop. *Defendant Henze, however, did not comply with this signal* but continued driving ahead for a distance of about 100 yards before pulling over and stopping. *During this period defendant Hulten was seen to lean forward and furtively attempt to place something under the front seat.*

The procedures of the police thereafter are adequately de-

scribed in the majority opinion. My colleagues expressly state that they do not "question the validity of the search for weapons and the subsequent arrest of the defendants, if their initial detention was authorized." Neither do they question the propriety of the incidental search of the defendants' car, made after their arrest, which resulted in the discovery of rolls of coins, loose change, and various other items identified as property which had been stolen from the Truman home.

Therefore, we are once again confronted with the same narrow question presented to this court in *People* v. *Cowman,* 223 Cal.App.2d 109, 111 [35 Cal.Rptr. 528] (hearing denied). wherein we stated: "It is manifest, of course, that prior to the time defendant's vehicle was [ordered to stop], the officers had no probable cause either to arrest the occupants or to search the vehicle. Appellant does not contend otherwise. [Citations.] However, there is nothing whatsoever in the record to indicate that the officers' initial purpose in stopping the vehicle was to effect an arrest or to conduct a search thereof. We are presented, therefore, with a very narrow question, i.e., whether the mere stopping of the vehicle under the circumstances described constituted such an unreasonable invasion of defendant's rights that all the subsequent acts and discoveries of the officers must be condemned and rejected as the 'fruits of a poisonous tree.' It is our opinion that this determinative question must be answered in the negative; we think that both controlling precedent and common sense dictate this answer."

In *Cowman* the officers had stopped a motor vehicle for routine questioning of its occupants in circumstances considerably less compelling than those present in the instant case. (223 Cal.App.2d at p. 110.) In *Cowman,* as in the instant case, the circumstances which justified the subsequent arrest of the driver and the search of his vehicle did not develop until after the officers had ordered the vehicle to stop. (223 Cal.App.2d at p. 118.)

As previously noted, my colleagues necessarily agree that if the officers in the instant case had reasonable cause to detain these defendants for routine questioning, then the events which thereafter transpired provided ample justification for their arrest and the search conducted incident thereto. Their refusal to comply with the order to stop until something had been furtively concealed under the front seat provided the additional suspicious circumstances which justified the arrest and search.

It is respectfully submitted that it was most reasonable for the officers to regard the conduct of these two young adults as sufficiently unusual and suspicious not only to justify, but to require, their "momentary" detention "for the purpose of routine interrogation." (*Rios* v. *United States*, 364 U.S. 253, 262 [4 L.Ed.2d 1688, 1694, 80 S.Ct. 1431].) The activity of these men in dividing coins in such quantity while seated on the grass in a park in and of itself was enough to excite suspicion. The time of the activity is not without significance. It was on a Wednesday afternoon and at a time when these young adults might normally be expected to be either in school or at work.

If the money which these men were dividing had been earned or acquired in some legitimate way, it most likely would have been counted and divided at some other and more appropriate place. The demeanor and appearance of the defendants and the appearance of their battered vehicle could reasonably contribute to the suspicion-arousing actions of the defendants.

Realistic credit should be given to the experience and expertise of police officers in detecting and evaluating suspicious behavior. As we stated in *People* v. *Cowman, supra,* 223 Cal. App.2d 109, 117 (hearing denied), the ability of experienced police officers who have learned to perceive the suspicious nature of unusual conduct is an acquired ability which serves the safety and security of the law-abiding citizens of the community, the benefits of which "should not be lost because the cold record before a reviewing court does not contain all the particularized perceptions which may have been so meaningful at the scene."

The comments of Judge Wisot made at the conclusion of the trial strike me as being sound and reasonable. In response to an argument by defendants' counsel that the age of the defendants and the fact that they were not in school or otherwise engaged was irrelevant, the court observed: "THE COURT: No, I think it is very relevant, contrary to what you say, Counsel. You say that they are young adults. You urge the Court that they are young adults. And as they sit here in my court, I take cognizance of that fact and I say to myself, at that time of the morning, when an officer views these two men sitting on the grass of a park, passing to each other and dividing one for you and one for me, I assume that is what might be meant by dividing coins and rolls, and it is not the end of a hard working day, the officer has reasonable ground

to be alerted because he would be not performing the function for which we pay him if he didn't think it worthwhile and necessary to check a little bit further and to find out what these young men are doing here, what they are dividing at this time of day and in an open place in the park. I think an officer can't be criticized for being so alert to the public interest and in checking further . . . I say that the stopping of the automobile under these circumstances was a reasonable incident of a temporary detention as distinguished from an arrest. . . ."

In effect, the present decision extends the requirements essential to constitute probable cause for an arrest and search and prescribes them as necessary conditions precedent to every detention for purposes of routine interrogation. This is true because there is no suggestion whatsoever in the instant record that the intention of the officers in pursuing and halting appellants was to arrest them or to conduct a search of their car. Of course, after appellants had refused to comply with the officers' directions to stop and had been seen attempting to hide something under the seat, the officers had ample cause to arrest them and to search the vehicle, and I do not understand the majority decision to hold otherwise.

In the relatively early case of *Brinegar* v. *United States,* 338 U.S. 160 [93 L.Ed. 1879, 69 S.Ct. 1302] the majority of the court, on the basis of their assumption that the officers there intended to search the car from the outset and had adequate facts prior to stopping it to warrant such a search, were not required to discuss the question whether the officers would have been justified in stopping the car on the basis of some lesser quantum of evidence for purposes of interrogating the driver, but with no right to conduct a search thereof.

Nevertheless, Mr. Justice Burton, in his separate concurring opinion, noted that it was not necessary to establish probable cause for the search prior to the colloquy which followed after the car was stopped. He stated at page 178 [93 L.Ed. at p. 1892] : "The earlier events, recited in the opinion of the Court, disclose *at least ample grounds to justify the chase and official interrogation of the petitioner by the government agents in the manner adopted.*" He also aptly noted at pages 179-180 [93 L.Ed. at pp. 1892, 1893] : "Government agents have duties of crime prevention and crime detection as well as the duty of arresting offenders caught in the commission of a crime. . . . The performance of the first duties are as important as the performance of the last. In this case the per-

formance of the first halted the commission of the crime and also resulted in the arrest of the offender.''

In *Henry* v. *United States,* 361 U.S. 98, 103 [4 L.Ed.2d 134, 139, 80 S.Ct. 168] the majority of the court accepted the prosecution's *stipulation* that the arrest therein ''took place when the federal agents stopped the car.'' However, Mr. Justice Clark, in an opinion joined in by Chief Justice Warren, dissented and declared his view that the court was not required to accept the government's mistaken concession. He stated at page 106 [4 L.Ed.2d at p. 141] : ''In my view, the time at which the agents were required to have reasonable grounds to believe that petitioner was committing a felony was when they began the search of the automobile, which was after they had seen the cartons with interstate labels in the car. The earlier events certainly disclosed ample grounds to justify the following of the car, the subsequent stopping thereof, and the questioning of petitioner by the agents. This interrogation, together with the sighting of the cartons and the labels, gave the agents indisputable probable cause for the search and arrest.

''When an investigation proceeds to the point where an agent has reasonable grounds to believe that an offense is being committed in his presence, he is obligated to proceed to make such searches, seizures, and arrests as the circumstances require. *It is only by such alertness that crime is discovered, interrupted, prevented and punished. We should not place additional burdens on law enforcement agencies.*''

It was in the case of *Rios* v. *United States,* 364 U.S. 253 [4 L.Ed.2d 1688, 80 S.Ct. 1431] that the court first passed squarely upon the question presented by the instant case. The court there held that it was a question of fact whether or not the police had intended to and did arrest the petitioner when they took their positions at the doors of the taxicab in which he was a passenger. The government had argued that the policemen approached the taxi ''only for the purpose of routine interrogation, and that they had no intent to detain the petitioner beyond the momentary requirements of such a mission.'' (P. 262 [4 L.Ed.2d at p. 1694].) The court held that if the trier of the facts so found, then the conduct of the petitioner that thereafter followed amply justified his later arrest, search and subsequent conviction. The facts in *Rios* are stated as follows at pages 255-256 [4 L.Ed.2d at pp. 1690, 1691] : ''At about ten o'clock on the night of February 18, 1957, two Los Angeles police officers, dressed in plain clothes

and riding in an unmarked car, observed a taxicab standing in a parking lot next to an apartment house at the corner of First and Flower Streets in Los Angeles. The neighborhood had a reputation for 'narcotic activity.' The officers saw the petitioner look up and down the street, walk across the lot, and get into the cab. Neither officer had ever before seen the petitioner, and neither of them had any idea of his identity. Except for the reputation of the neighborhood, *neither officer had received information of any kind to suggest that someone might be engaged in criminal activity at that time and place, They were not searching for a participant in any previous crime.* They were in possession of no arrest or search warrants." (Italics supplied.) Nevertheless, as indicated, the United States Supreme Court held that it would have been proper to detain the suspect under such circumstances for the purpose of "routine interrogation."

Since there was absolutely no "unusual activity" present in *Rios,* and no "information of any kind to suggest . . . criminal activity," the factual picture there presented emphatically emphasizes the clear propriety of the officers' conduct in the instant case. I therefore cannot bring myself to concur in a judgment that overrules the determination here made by the finder of the fact and substitutes the legal conclusion that it is unconstitutional for the police to ask two young men why they are dividing large numbers of coins in a park at a time when normally they should be in school or at work.

Respondent's petition for a hearing by the Supreme Court was denied October 25, 1967. McComb, J., Mosk, J., and Burke, J., were of the opinion that the petition should be granted.