[Crim. No. 14292. Second Dist., Div. Two. Jan. 7, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. FLOYD
WILLIAM MANIS, JR., Defendant and Appellant.

Albert I. Kaufman, under appointment by the Court of Appeals, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Elizabeth Miller, Deputy Attorney General, for Plaintiff and Respondent.

FLEMING, J.—Second degree burglary. Appellant contends, first, that evidence at his trial derived from an illegal detention; second, that evidence was obtained in violation of his rights under *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; and third, that his confession was erroneously considered by the trial court.

About noon on 24 January 1967 during a heavy rainstorm, Officer Gaines, a burglary investigator for the Los Angeles Police Department, saw appellant without a raincoat walk by his patrol car, heading west on Eighth Street and carrying what appeared to be a new portable typewriter case. Because many burglaries in that area involved stolen typewriters, and because appellant was apparently exposing a new portable typewriter to a heavy downpour (most typewriter cases are not waterproof), Officer Gaines and his partner followed. Appellant continued west on Eighth Street and then north on Alvarado Street toward an area of several pawnshops. From time to time he looked back in the officers' direction.[1] After appellant crossed Seventh Street the officers drove past him, and when they did so appellant reversed his direction, returned to Seventh Street, and headed west. As the officers made a U-turn to go back to Seventh Street, appellant turned into MacArthur Park. At that point the officers left their car, and stopped appellant in the tunnel under Wilshire Boulevard.

---

[1] Officer Gaines testified:
"Q Would you say he was looking around in a normal manner as a person walking down the street?
A No, sir.
Q You wouldn't. What was not normal about the way he was looking around?
A He was walking north looking south."

Officer Gaines, after identifying himself, asked appellant where he was going. Santa Monica, the latter replied. How would he get there? Walk. What was in the case he had set down? Radios. Did he have a receipt for the radios? "No," said appellant, "I stole them." The police arrested appellant and advised him of his constitutional rights. Four radios with Bullock's department store tags were found in the case. Appellant told the officers he had spent the previous night in Bullock's and walked out of the store that morning with the radios in the case.

At the preliminary hearing a saleswoman for Bullock's testified the radios in appellant's possession were those missing from the store on the morning of 24 January. She had been the last person to leave the radio department the previous night and had forgotten to lock up. For reasons not apparent from the record, the court in the preliminary hearing ruled appellant's confession of burglary inadmissible and ordered it stricken, but did permit appellant's pre-arrest admission of theft, "I stole them," to stand.

The cause was submitted to the trial court on the transcript of the preliminary hearing, supplemented by appellant's testimony on the circumstances of his arrest. Appellant was convicted of second degree burglary.

Appellant's first two claims are interrelated. Initially, he argues there was insufficient cause to detain him on the street and therefore all evidence resulting from that detention—the radios, the case, and his admission of theft—was illegally obtained and hence inadmissible. In the alternative, he argues that if sufficient cause for his detention existed, then his admission of theft was improperly elicited during a custodial interrogation because of the failure to give the warning required by *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

Appellant's argument requires us to again consider what circumstances justify temporary detention of a suspect and what action the police may take during a period of detention.

*Temporary Detention*

The law in California on the subject of temporary detention for investigation may be briefly summarized. ■ Circumstances short of probable cause for an arrest may justify temporary detention of a person by a peace officer for investigation and questioning. (*People* v. *Mickelson,* 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658]; *People* v. *Martin,* 46

Cal.2d 106, 108 [293 P.2d 52].) The circumstances which allow temporary detention are those which "indicate to a reasonable man in a like position that an investigation is necessary to the discharge of his duties." (*People* v. *Gibson,* 220 Cal.App.2d 15, 20 [33 Cal.Rptr. 775].)

Earlier doubts about the constitutionality of temporary detention on less-than-probable-cause-for-arrest have been largely dispelled by the decision of the United States Supreme Court in *Terry* v. *Ohio,* 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868]. There the court sustained a police officer's accost and frisk of loiterers on the street who were behaving suspiciously and were suspected by the officer of planning a holdup. The court recognized "that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." (392 U.S. at p. 22 [20 L.Ed.2d at pp. 906-907].) In upholding the validity of the police officer's protective search for weapons, the court said: "It does not follow that because an officer may lawfully arrest a person only when he is apprised of facts sufficient to warrant a belief that the person has committed or is committing a crime, the officer is equally unjustified, absent that kind of evidence, in making any intrusions short of an arrest." (392 U.S. at p. 26 [20 L.Ed.2d at p. 909].) Explicit in the decision is approval of police investigation "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot . . ." (392 U.S. at p. 30 [20 L.Ed.2d at p. 911].)

The validity of any particular temporary detention involves a determination of fact. While the circumstances which justify temporary detention may be bewilderingly diverse, still we have acquired a rough picture of the situations in which such detention is warranted. "First, there must be a rational suspicion by the peace officer that some activity out of the ordinary is or has taken place. Next, some indication to connect the person under suspicion with the unusual activity. Finally, some suggestion that the activity is related to crime." (*People* v. *Henze,* 253 Cal.App.2d 986, 988 [61 Cal.Rptr. 545].) We have heretofore outlined some of the factors which, separately, or in combination, justify the use of the power to temporarily detain for investigation. (*People* v. *Henze, supra.*) The case at bench furnishes another example of circumstances sufficiently suspicious and out of the

ordinary to properly suggest to the police that the activity of a particular person may be connected with crime. Appellant was walking without a raincoat in heavy rain, making no attempt to protect what appeared to be a valuable piece of machinery. The area was one in which many burglaries involving typewriters had occurred. When first observed, appellant appeared headed for a pawnshop area, but on the visible interest of the police in his movements he reversed direction and went into a park. A commonplace of law enforcement tells us that a great amount of stolen property funnels into pawnshop areas. (Vol. 3, Appendix to Journal of Senate, Reg. Session, 1957, Progress Report on Pawnbrokers, pp. 9, 196.) When appellant's activity and conduct are appraised in the light of the area and the circumstances in which they took place, they reasonably suggest the possibility that appellant was about to pawn a stolen typewriter, a suggestion sufficiently tangible to warrant investigation.

The facts of the case somewhat resemble those in *People* v. *Beasley,* 250 Cal.App.2d 71 [58 Cal.Rptr. 485]. There, an office had been burglarized, and a power saw and calculator stolen. That afternoon two police officers on routine pawnshop patrol observed two men talking to a clerk about a power saw on the counter. The clerk asked one of the men for identification, and the latter replied he had none. At that point the police identified themselves and began to question the two men about the transaction, questioning which in due course led to the arrest of the two on a charge of receiving stolen property. The Court of Appeal concluded the police had reasonable cause to investigate and question, and therefore the evidence which resulted from their investigation should not have been suppressed.

To support his argument against the validity of the temporary detention appellant relies on *People* v. *One 1960 Cadillac Coupe,* 62 Cal.2d 92 [41 Cal.Rptr. 290, 396 P.2d 706]. In that case Reulman had parked his Cadillac across the street from a flower planter box in which a narcotics kit had been found earlier in the day and was walking back and forth on the opposite sidewalk when questioned by the police. He appeared to be nervous. The trial court concluded that the circumstances were not sufficiently suspicious to justify the temporary detention for investigation which had led to the discovery of marijuana in the Cadillac, and denied forfeiture of the vehicle under the narcotic laws. The Supreme Court affirmed on appeal, stating: "We find little, if anything, to distinguish

Reulman from any other harried citizen who may have innocently parked his automobile in the same spot as did Reulman. The trial judge's finding that reasonable cause for detention and questioning is lacking is thus substantially supported by the record.'' While the case at bench contains some of the elements found in Reulman's case, it also contains others of a more unusual character, and the combination of these elements provides a rational suspicion of misconduct. We conclude that appellant's dress, conduct, and movements in the setting of their time and place were sufficiently unusual to justify temporary detention for investigation by the police.

### Questioning During Temporary Detention

The purpose of temporary detention is to enable the police to determine, with minimum upset to public tranquility and minimum intrusion into personal rights, whether they should arrest a suspect and charge him with crime, whether they should investigate further, or whether they should take no action because their initial suspicion proved groundless. What tools do we allow the police to use in making a decision which often calls for the employment of nice discrimination? Obviously, the police can use their sense of sight, hearing, and smell and thereby obtain a certain amount of information from the person's dress, appearance, physical condition, and demeanor. But where, as here, the circumstances which have induced the temporary detention suggest that stolen property is about to be pawned, the keenest personal observation is apt to prove uninformative and unenlightening. In this, as in many investigations, progress toward a rational decision about what to do next can only be made by asking questions. The information needed by the police to make an intelligent decision on street detention is ordinarily obtainable only from the suspect's answers. ''Despite modern advances in the technology of crime detection, offenses frequently occur about which things cannot be made to speak. And where there cannot be found innocent human witnesses to such offenses, nothing remains—if police investigation is not to be balked before it has fairly begun—but to seek out possibly guilty witnesses and ask them questions, witnesses. that is, who are suspected of knowing something about the offense precisely because they are suspected of implication in it.'' (*Culombe* v. *Connecticut,* 367 U.S. 568, 571 [6 L.Ed.2d 1037, 1040, 81 S.Ct. 1860].)

Do we then allow the police to ask questions of persons suspected of crime who have been temporarily detained

for investigation? In California the answer is yes, an answer initially formulated as the privilege of the police to seek out and question suspects and those believed to have knowledge of crime, but which has been subsequently broadened to include brief questioning of persons who have been involuntarily detained. (*People* v. *Mickelson,* 59 Cal.2d 448, 450-452 [30 Cal.Rptr. 18, 380 P.2d 658]; *People* v. *Martin,* 46 Cal.2d 106, 108 [293 P.2d 52]; *People* v. *Blodgett,* 46 Cal.2d 114, 117 [293 P.2d 57]; *People* v. *Michael,* 45 Cal.2d 751, 754 [290 P.2d 852]; *People* v. *Machel,* 234 Cal.App.2d 37, 46 [44 Cal.Rptr. 126]; *People* v. *Cowman,* 223 Cal.App.2d 109 [35 Cal.Rptr. 528]; *People* v. *Beverly,* 200 Cal.App.2d 119, 125 [19 Cal. Rptr. 67]; *People* v. *King,* 175 Cal.App.2d 386, 390 [346 P.2d 235]; *People* v. *Jackson,* 164 Cal.App.2d 759 [331 P.2d 63].)

The implications of *Terry* v. *Ohio,* 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868], tend to support the validity of these California rulings and sustain the constitutional propriety of brief questioning by the police of suspects whom they have temporarily detained. Although the majority opinion of the Supreme Court expressly reserved the question of the propriety of investigative seizure on less than probable cause for purposes of interrogation (392 U.S. at p. 19 [20 L.Ed.2d at p. 905]), that question was discussed by Justices Harlan and White, whose concurring opinions persuade us of the continued vitality of the California decisions upholding the authority of the police to temporarily detain and question suspects. Mr. Justice Harlan calls this authority the right of a police officer in appropriate circumstances to force an encounter with a citizen and insist on the latter's presence. "That right must be more than the liberty (again, possessed by every citizen) to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away; he certainly need not submit to a frisk for the questioner's protection. I would make it perfectly clear that the right to frisk in this case depends upon the reasonableness of a forcible stop to investigate a suspected crime. . . . [The officer's] justifiable suspicion afforded a proper constitutional basis for accosting Terry, restraining his liberty of movement briefly, and addressing questions to him, and Officer McFadden did so." (392 U.S. at pp. 32, 33 [20 L.Ed.2d at pp. 912, 913].) Mr. Justice White was of the same opinion: ". . . . I think an additional word is in order concerning the matter of interrogation during an investigative stop. There is nothing in the Constitution which prevents a

policeman from addressing questions to anyone on the streets. Absent special circumstances, the person approached may not be detained or frisked but may refuse to cooperate and go on his way. However, given the proper circumstances, such as those in this case, it seems to me the person may be briefly detained against his will while pertinent questions are directed to him. Of course the person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest, although it may alert the officer to the need for continued observation. . . . But if the investigative stop is sustainable at all, constitutional rights are not necessarily violated if pertinent questions are asked and the person is restrained briefly in the process.'' (392 U.S. at pp. 34-35 [20 L.Ed.2d at pp. 913-914].)

██ We conclude from *Terry* that the California rule which permits brief questioning of a suspect temporarily detained by the police for investigation is constitutionally valid.

*Warning Before Questioning*

But if the circumstances are sufficiently suspicious to justify temporary detention are they not sufficiently incriminating to require the police to advise the person detained of his privilege against incrimination and his right to assistance of counsel? Appellant argues in the affirmative—detention is justified only when there is a reasonable basis for suspicion, and whenever a reasonable basis for suspicion exists, the suspect should be warned against incrimination and against statements without assistance of counsel.

We think some anlaysis of the procedures involved may clarify the relationship between temporary detention and incrimination and help the court strike an appropriate balance between the community's interest in law enforcement and the individual's interest in immunity from police interference. (*People* v. *Mickelson,* 59 Cal.2d 448, 452 [30 Cal. Rptr. 18, 380 P.2d 658].) ██ First, some elaboration of the specific boundaries of temporary detention. These encompass a limited restriction of the personal mobility of a suspect, for a brief period of time, usually in a public place, normally without transfer to another location. This limited restriction of movement may be accompanied by brief questioning on matters which had aroused the suspicion. Probable cause for arrest on a specific charge of crime does not exist, and no accusation has been, or can be, made at the time of the initial detention.

Perhaps a few concrete examples of circumstances in which temporary detention is customarily used will give form and content to its general idea.[2]

Item: A motorist driving in an eccentric manner on the freeway.

The police suspect the possibility the driver may be intoxicated.

Item: A motorist driving without proper lighting on his license plates and with dirt obscuring the visibility of the numbers.

The police suspect the possibility the car may be stolen.

Item: A driver sitting in an automobile with the motor racing at the side entrance of a suburban bank during banking hours.

The police suspect the possibility of a holdup.

Item: A motorist driving a truck without lights from a closed warehouse driveway at 2 a.m.

The police suspect the possibility of theft or commercial fraud.

Item: A man staggering on the street outside a bar at 11 p.m.

The police suspect the possibility of drunkenness in a public place.

Item: Two men parked in an automobile in lovers' lane at midnight with the lights out.

The police suspect the possibility of an attempt at robbery or rape.

Item: A man on the street at 11 p.m. in a high burglary area carrying several large bulky cardboard cartons.

The police suspect the possibility of burglary.

Item: An elderly man in a public park in the afternoon offering candy to young children and patting them on the arm.

The police suspect the possibility of child molestation.

Item: The appearance on the highway of three men in a

---

[2]The examples do not reflect the facts of particular cases but have been suggested by the following: *People* v. *Anguiano*, 198 Cal.App.2d 426 [18 Cal.Rptr. 132]; *People* v. *Anushevitz*, 183 Cal.App.2d 752 [6 Cal.Rptr. 785]; *People* v. *Cowman*, 223 Cal.App.2d 109 [35 Cal.Rptr. 528]; *People* v. *Beverly*, 200 Cal.App.2d 119 [19 Cal.Rptr. 67]; *People* v. *Martin*, 46 Cal.2d 106 [293 P.2d 52]; *People* v. *West*, 144 Cal.App.2d 214 [300 P.2d 729]; *People* v. *Jackson*, 164 Cal.App.2d 759 [331 P.2d 63]; *People* v. *One 1958 Chevrolet*, 179 Cal.App.2d 604 [4 Cal.Rptr. 128]; *People* v. *King*, 175 Cal.App.2d 386 [346 P.2d 235].

Further examples may be found in Tiffany, McIntyre & Rotenberg, Detection of Crime: Stopping and Questioning, Search and Seizure, Encouragement and Entrapment (1967) pp. 18-56.

grey Chevrolet after the police have received a report of a gas station stickup an hour ago in another part of the city by three men in a grey Chevrolet.
The police suspect the possibility the men are wanted for robbery.

In each of these instances police investigation is called for because there is some rational suspicion that the persons involved have committed, are committing, or are about to commit some crime. This suspicion, although rational, does not constitute probable cause to make an arrest and, as often as not, the suspicion may be quickly dissipated by an explanation from the actors involved.

■ When we reflect on the commonplaceness of such events and the frequency of their occurrence, it seems evident that temporary detention provides a legally useful procedure which the police should use on appropriate occasion for the benefit of the community. The stopping and questioning by police officers of persons whose conduct, although suspicious, does not give probable cause for arrest, essentially amounts to a halfway house between the station of arrest on probable cause and that of official inaction. Although legal theory has never found it necessary to delineate the dimensions of this halfway house or construct a jurisprudential roof to cover it, in actual fact it has always existed on the road running between official action and official inaction. For example, customs, quarantine, and immigration authorities dealing with the traveler returning from abroad not only possess certain powers of arrest but in practice exercise an authority to temporarily detain and question the traveler in connection with their investigations. The purpose of detention is to keep things as they are during the investigation, and the purpose of questioning is to move the investigation along. The great engine of the investigation is questioning—on the spot, at the time, to the point—for in many instances detention without questioning would be useless. A similar relationship between detention and questioning exists in police investigation.

■ When circumstances demand immediate investigation by the police, the most useful, most available tool for such investigation is general on-the-scene questioning, designed to bring out the person's explanation or lack of explanation of the circumstances which aroused the suspicion of the police, and enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.

From the point of view of the person detained, temporary detention clearly amounts to some deprivation of his personal freedom of movement. Yet freedom is not absolute, and rights are correlative to duties. ■■■ The temporary loss of personal mobility which accompanies detention may be deemed part payment of the person's obligation as a citizen to assist law enforcement authorities in the maintenance of public order, an obligation reflected in the operation of such traditional institutions as the sheriff's posse, the hue and cry, etc. (Pen. Code, § 150; Gov. Code, § 26604.) Nor should the deprivation of his freedom of movement be considered all loss by the person detained, for in fulfilling his obligation as a citizen he is also serving his own interests. The person detained has two interests at stake, his specific interest in unrestricted freedom of movement, and his general interest as a member of the community in the preservation of public peace and tranquility. In clearing himself of suspicion and releasing the police for other duties connected with the maintenance of public peace he is broadly serving his general interest as a citizen. Although in times of tranquility he tends to assume that his first interest is paramount and his second one inconsequential, times are not always tranquil, and the persistence of crime and civil disorder serves as a continuing reminder of his substantial and direct interest in public peace, for whose preservation he must at times make some personal sacrifice.

■■■ We next consider the procedure which requires warning against incrimination. This has been formulated in the following rule: at the time a suspect becomes an accused, the police before questioning him must inform him he has a right to remain silent, anything he says can be used against him in a court of law, he is entitled to the presence of an attorney, and if he is unable to afford an attorney one will be appointed for him if he so desires. (*Miranda* v. *Arizona,* 384 U.S. 436, 479 [16 L.Ed.2d 694, 726, 86 S.Ct. 1602, 10 A.L.R.3d 974].) The nature of the required warning presupposes the existence of an accused, whose questioning without warning would be for accusatory rather than investigatory purposes. (*Escobedo* v. *Illinois,* 378 U.S. 478, 492 [12 L.Ed.2d 977, 986, 84 S.Ct. 1758].) The point in time at which a suspect metamorphoses into an accused is now identified as not later than the time a person has been taken into custody, actual or constructive, for the purpose of being charged with crime. At that point the requirement of warning under the *Miranda* rule comes into play automatically.

■ Custody has become the critical element which triggers the necessity for warning against incrimination, and appellant argues we should equate temporary detention with custody for purposes of the required warning. But to classify temporary detention as a form of custody which thereby initiates the accusatory stage of a criminal proceeding would distort the accepted meaning of custody and ignore the legal formalities which attach to it.[3] In California the status of custody presupposes an arrest for a particular charge and advice by the arresting officer of his intention to arrest, of the cause of arrest, and of his authority to make it. (Pen. Code, § 841.) A subsequent complaint stating the charge against the arrested person is normally required. (Pen. Code, § 849.) Thus, custody implies an arrest on a particular charge, followed by an accusation initiating the criminal process.

■ When the police do not know whether a crime has been committed and do not have probable cause to arrest a suspect on a specific charge it is self-evident they do not possess valid authority to take a suspect into custody.

■ Temporary detention only slightly resembles custody, "as the mist resembles the rain."[*] True enough, a person temporarily detained has been subjected to some restraint and his freedom of movement has been temporarily restricted. But the person detained is in no sense an accused but rather one merely suspected of misconduct. Since the police can make no valid accusation against him, we do not think the process has shifted from investigatory to accusatory (*Escobedo* v. *Illinois, supra,* at p. 492 [12 L.Ed.2d at p. 987]), or that an investigation has "focused on an accused" (*Miranda* v. *Arizona, supra,* at p. 444, fn. 4 [16 L.Ed.2d at p. 706]). Only when suspicion focuses sharply enough to provide reasonable cause for arrest or charge does the relationship between the police and the person detained become that of accuser and accused.

■ The nature of the warning required by *Miranda* has itself become a significant factor in the process, for to properly deliver the warning consumes an appreciable amount of

---

[3]The distortion may be illustrated by the following syllogism:

Custody requires probable cause for arrest.

Temporary detention is a form of custody.

Therefore, temporary detention requires probable cause for arrest.

But we know from *Terry* v. *Ohio,* 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868], and *People* v. *Mickelson,* 59 Cal.2d 448 [30 Cal.Rptr. 18, 380 P.2d 658], that the conclusion is incorrect.

[*]Longfellow: ''The Day Is Done.''

time, perhaps a minimum of 45 seconds.[4] The length and formality of the warning and the somewhat detailed legal advice it imparts persuade us it need not be given in every transitory, informal, or casual exchange between police and suspect, even those in which the suspect's presence has been compelled. To initiate each encounter between police and suspect with a 45-second warning on the perils of talking without counsel would, we believe, unnecessarily formalize the relationship between the two and unnecessarily inhibit the police from carrying out their traditional function of investigating crime. Until such time as the police have probable cause to make an accusation, the relationship between suspect and police remains that of citizen and peace officer rather than accused and accuser.

The distinction between transitory restraint and more permanent restraint has been preserved in the *Miranda* opinion itself, which defines custodial interrogation as questioning initiated by law enforcement officers while an individual is in custody or otherwise deprived of his freedom in any *significant* way. (*Miranda* v. *Arizona,* 384 U.S. 436, 444, 445, 467, 477, 478 [16 L.Ed.2d 694, 706, 707, 719, 725, 726, 86 S.Ct. 1602].) The opinion distinguishes restraint which is significant from that which is not, and the final editing of the court's opinion points up the care which the court took to

---

[4]The Los Angeles Police Department advises its officers to give the following admonition and ask the following questions:

''Admonition of Rights

When a suspect in custody is to be interrogated regarding his possible participation in the commission of a criminal offense, he shall be 'warned' exactly as follows:

1. You have the right to remain silent.
2. If you give up the right to remain silent, anything you say will be used against you in a court of law.
3. You have the right to speak with an attorney and to have the attorney present during questioning.
4. If you so desire and cannot afford one, an attorney will be appointed for you without charge before questioning.

After the admonition has been given, the following questions shall be asked:

1. Do you understand each of these rights I have explained to you?
2. Do you wish to give up the right to remain silent?
3. Do you wish to give up the right to speak to an attorney and have him present during questioning?

Include in any resulting report or recording of the interview:

1. The admonition of rights in its entirety, AND
2. Statements indicating the subject's understanding of the admonition, AND
3. Statements indicating whether the suspect waived his rights to remain silent and to have an attorney present, and how he waived them.''

(LAPD Form 15.3 (Dec. '67).)

preserve this distinction. In its Preliminary Print the court declared that its rule applied whenever a person was "in custody at the station or otherwise deprived of his freedom of action in any way" (p. 447 [16 L.Ed.2d at p. 708]; see also pp. 445, 467, 478 [16 L.Ed.2d at pp. 707, 719, 725-726].) However, in the bound volume of its Official Reports the court amended the text of its opinion in several instances to make its rule applicable to a person "in custody at the station or otherwise deprived of his freedom of action in any *significant* way" (p. 477 [16 L.Ed.2d at p. 725]). to one "deprived of his freedom of action *in any significant way*" (p. 445 [16 L.Ed.2d p. 725]), to "persons in all settings in which their freedom of action is curtailed *in any significant way*" (p. 467 [16 L.Ed.2d at p. 719]), to one "taken into custody or otherwise deprived of his freedom by the authorities *in any significant way*" (p. 478 [16 L.Ed.2d at p. 726].) (Italicized matter added by the court in its permanent text.) In making these revisions to its original published opinion it seems apparent the court wished to differentiate between significant restraint and transitory restraint and to limit the requirement of the four-fold *Miranda* warning to instances of significant restraint. ▮▮▮ From another portion of the court's opinion we infer that general on-the-scene questioning does not fall within the category of legally significant restraint. The court said: "General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." (Pp. 477-478 [16 L.Ed.2d at pp. 725-726].)

▮▮▮ We conclude that persons temporarily detained for brief questioning by police officers who lack probable cause to make an arrest or bring an accusation need not be warned about incrimination and their right to counsel, until such time as the point of arrest or accusation has been reached or the questioning has ceased to be brief and casual and become sustained and coercive.[5]

---

[5]The scope of permissible questioning of a suspect who has been temporarily detained is illustrated by the text of the New York Stop and Frisk Law (New York Code Crim.Proc., § 180a) and the text of the Uniform Arrest Act (section 2). Under the New York law a police officer may ask a suspect his name, address, and an explanation of his actions. Under the

We do not find the ruling in *People* v. *Ceccone,* 260 Cal. App.2d 886 [67 Cal.Rptr. 499], inconsistent with this opinion. In that case the police stopped the defendant for running a red light. They began to suspect him of auto theft when he could produce neither a driver's license nor the registration slip for the vehicle he was driving. After he was ordered out of the automobile one officer observed what he believed to be dangerous drugs on the front seat, and on closer inspection the officer discovered a bag containing what appeared to be marijuana. He asked defendant what was in the bag, and the latter replied marijuana. The Court of Appeal concluded that '' [o]nce the investigating officer has probable cause to believe that the person being detained for questioning has committed an offense, the officer cannot be expected to permit the suspect to leave. At that point, at the latest, the interrogation becomes custodial and prior to any further questioning the suspect must be warned of his rights.'' (260 Cal.App.2d at pp. 892-893.) Since the police had probable cause to believe the defendant was driving a stolen vehicle and was in possession of dangerous drugs and marijuana, it did not appear likely the police could have turned him loose, and defendant was, therefore, constructively in custody. (260 Cal.App.2d at p. 893.)

In effect, the court in *Ceccone* followed the English practice, which permits a police officer to question a suspect until such time as the officer acquires enough evidence to prefer a criminal charge, at which time he must then deliver a warning.[6] In the present case that point had not been reached at the time of initial detention.

---

Uniform Arrest Act, a peace officer may ask a suspect his name, address, business abroad, and whither he is going.

The questions addressed to Manis fell squarely within these definitions of permissible questioning of suspects.

[6]The 1964 revision of Judges' Rules reads in part:

''I. When a police officer is trying to discover whether, or by whom, an offence has been committed he is entitled to question any person, *whether suspected or not,* from whom he thinks that useful information may be obtained. This is so whether or not the person in question has been taken into custody so long as he has not been charged with the offence or informed that he may be prosecuted for it.

''II. As soon as a police officer has evidence which would afford reasonable grounds for suspecting that a person has committed an offence, he shall caution that person or cause him to be cautioned before putting to him any questions or further questions relating to that offence.'' (Italics added.)

Under the English practice not only would the police have been authorized to stop and question Manis, but they could have searched him for suspected stolen property or contraband. Section 66 of the Metropolitan

*Improper Consideration of Stricken Evidence*

 Appellant's final contention claims prejudice from the trial court's consideration of a confession which had been stricken from the record. While it is true the trial court did refer to evidence which had been stricken from the record at the preliminary hearing, we believe the error was nonprejudicial beyond a reasonable doubt. (Cal. Const., art. VI, § 13; *Chapman* v. *California,* 386 U.S. 18, 23 [17 L.Ed.2d 705, 87 S.Ct. 824].) Even without the confession the evidence against appellant remained overpowering. He was found in possession of merchandise bearing tags which established that it had been stolen from a nearby store the previous night. Possession of stolen goods, coupled with a failure to satisfactorily explain such possession, is sufficient evidence to convict of burglary. (See, e.g., *People* v. *Jenkins,* 223 Cal.App.2d 537, 541 [35 Cal.Rptr. 776]; *People* v. *Giffis,* 218 Cal.App.2d 53, 58-59 [32 Cal.Rptr. 215]; *People* v. *DeLeon,* 236 Cal.App.2d 530, 533 [46 Cal.Rptr. 241].) When to possession of stolen goods there is added the defendant's admission that he stole them, proof of burglary has almost become demonstration. (See *People* v. *Corral,* 60 Cal.App.2d 66, 72-73 [140 P.2d 172].)

 We conclude that any error arising from the court's improper consideration of stricken evidence which, in essence, duplicated properly admitted evidence and cumulated matters otherwise proved, was non-prejudicial beyond a reasonable doubt. (Cal. Const., art. VI, § 13; *People* v. *Jacobson,* 63 Cal.2d 319, 330-331 [46 Cal.Rptr. 515, 405 P.2d 555]; *People* v. *Cotter,* 63 Cal.2d 386 [46 Cal.Rptr. 622, 405 P.2d 862].)

The judgment is affirmed.

Roth, P. J., and Herndon, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 5, 1969.

---

Police Act (1839) authorizes a police officer to stop and search any person, carriage, or vessel on which he has reason to suspect that anything stolen or unlawfully obtained may be found. (See *Willey* v. *Peace* (1951) 1 K.B. 94.) As stated by Chief Justice Goddard: ''By that section a police officer who suspects on reasonable grounds that a person is carrying something stolen or unlawfully obtained may stop him, search him, and then, if necessary, detain him.''