[Civ. No. 9673. Fourth Dist., Div. Two. July 7, 1969.]

ARTHUR LEE JACKSON, Petitioner, v. THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, Respondent; LOWELL E. LATHROP, as District Attorney, etc., Real Party in Interest.

Charles E. Ward, Public Defender, and Raymond Rager, Deputy Public Defender, for Petitioner.

Lowell E. Lathrop, District Attorney, and Kenneth W. Nydam, Deputy District Attorney, for Real Party in Interest.

GARDNER, J. pro tem.*—This is a petition for a writ of prohibition by defendant petitioner after an unfavorable ruling on a hearing under Penal Code, section 1538.5

At 11:45 p.m. on November 15, 1968, Officer Zini, and another member of the San Bernardino Police Department were on patrol on Flores Street in San Bernardino. In addition to their general patrol duties, they were looking for one L. C. Jackson who was wanted by the sheriff's office for assault with intent to commit murder and who "was known to be living or staying at a house at 23d and Flores." About a week prior to the 15th, Officer Zini had talked to Mrs. Barbara Jackson who lived in the house at 2301 Flores. She told him that L. C. Jackson frequented the house "quite often"; that she didn't know where he was; that he would "pop in" at any moment; that he came in "now and then"; that she didn't know when he was going to arrive or going to leave; that he had spent much time there; and that he had stayed at length at that residence. (Mrs. Barbara Jackson was not related to L. C. Jackson.) The officer made no inquiry as to how long L. C. Jackson stayed there or the rate of frequency of his visits. The officer further testified, "From our conversation with Mrs. Jackson, we knew that the place should be watched as much as possible, seeing that the sheriff's office still had the A.P.B. out on L. C. Jackson; so we kept this in mind being the beat officers in that area."

The officer also knew that a 1958 Chevrolet convertible, black top and white bottom, which had been parked in front of that house belonged to L. C. Jackson. On the night of the 15th this car was gone.

On the 15th, as the officers approached 23d Street on Flores they saw a late model vehicle, dark in color, which they "couldn't tell exactly what it was," parked directly in front of Mrs. Jackson's house; they then saw two subjects, both of whom were Negroes (L. C. Jackson also being a Negro), getting into this vehicle; the driver was already behind the wheel and the passenger was just sitting down and closing the door. As the passenger door closed, the light inside went off and the officers were unable to see who was inside the car. The car started up at a normal rate of speed and the officers were able

---

*Assigned by the Chairman of the Judicial Council.

to ascertain that it was a Dodge, later found to be a 1968 vehicle. The officers followed this car in an effort to see who was inside the car. The car proceeded at a normal rate of speed. The officers followed it for a short distance but were still unable to get a good look at the persons inside to see if either was L. C. Jackson although they tried to move up closer to get a close look. The officers followed the car and a few blocks later stopped it to see if L. C. Jackson was in the car. They knew L. C. Jackson by sight. They saw no suspicious activity on the part of the occupants of the car, nor was any law violation noted as they followed the car.

As the officers turned on the red light to stop the car, Officer Zini observed a can thrown from the vehicle. He retrieved this can, found it was an open beer can with beer in it. As the vehicle stopped, both persons in the vehicle voluntarily got out of the car and walked towards the officers and identified themselves. They were never ordered from the car. Neither of the occupants was the subject, L. C. Jackson. The driver was the petitioner, Arthur Lee Jackson (no relation to either Mrs. Barbara Jackson or L. C. Jackson), age 19. The officers then looked into the car, saw a glass bottle of orange juice with paper cups on the floor of the vehicle. Officer Zini then reached into the car to get the bottle of orange juice to see if it contained alcohol and when he did so, saw first one plastic baggie and then subsequently another plastic baggie, both of which contained marijuana. The petitioner makes no complaint about the resultant search after the car was stopped, merely the original stopping.

Thus the only question presented is: Was the action by the police officers in stopping defendant's car under the circumstances here presented a violation of defendant's constitutional rights to such an extent that the search thereafter conducted could not be deemed legal and evidence thereby obtained made inadmissible? We answer that question in the negative.

Circumstances short of probable cause to make an arrest may still justify an officer stopping a pedestrian or motorist on the street for questioning. (*People* v. *Moore,* 69 Cal.2d 674, 682 [72 Cal.Rptr. 800, 446 P.2d 800] ; *People* v. *Mickelson,* 59 Cal.2d 448, 450-451 [30 Cal.Rptr. 18, 380 P.2d 658] ; *People* v. *Martin,* 46 Cal.2d 106, 108 [293 P.2d 52] ; *People* v. *Manis,* 268 Cal.App.2d 653, 658-659 [74 Cal.Rptr. 423] ; *People* v. *Gibson,* 220 Cal.App.2d 15, 20 [33 Cal.Rptr. 775].)

However, there must exist some suspicious or unusual circumstances to authorize this invasion of privacy. (*Wood* v. *Superior Court,* 220 Cal.App.2d 242, 245 [33 Cal.Rptr. 782].)

A police officer may not detain nor question a person when there are no circumstances which would indicate to a reasonable man in a like position that such a course was necessary to a proper discharge of the officer's duties. (*People* v. *Moore, supra,* 69 Cal.2d 674, 682-683.)

It should be noted that in this case the officers were not stopping the car to question the occupants, but only for identification, i.e., to *see* if either of the two occupants was, in fact, L. C. Jackson.

It would appear beyond argument that in the proper discharge of their duty, the officers in this case had a responsibility to take all reasonable steps to effect the arrest of L. C. Jackson who was wanted for a serious felony. It would also appear beyond argument that before they could arrest L. C. Jackson, it was necessary to properly identify him.

The threshold question then becomes, did the officers have sufficient information on which to follow the car on the rational possibility that L. C. Jackson was in it? The second question then becomes, lacking the ability to identify him positively was their stopping of this car for this identification reasonable in the proper discharge of their duties?

L. C. Jackson frequented the house at 2301 Flores Street. He came in quite often, "popped in" at any moment, came in "now and then." It would appear that the expression used by the officer that L. C. Jackson "frequented" this house is not improper. Thus the officers had a lead, and it was their responsibility in the interests of efficient law enforcement to follow up on this lead. They were obviously keeping the house under a type of loose surveillance for that purpose. As they approached this house, two subjects, who were Negroes (as was L. C. Jackson) were getting into the car which was parked in front of the house. It was a reasonable and rational inference on the officers' part that the subjects getting into the car had just come from the house. It would follow that it would appear reasonable for the officers to attempt to see if either of these individuals was L. C. Jackson. They attempted to do so in such a way as to avoid any inconvenience to the occupants of the car when they tried to get up close to get a look at the occupants. They knew L. C. Jackson by sight. They did not need to question anyone; they did not want to search them or arrest them. The occupants need not even have

gotten out. One look would have satisfied the officers that neither was L. C. Jackson.

The police officers had a rational suspicion that one of the occupants might be L. C. Jackson. This admittedly was not enough for an arrest or for a search, but enough for temporary detention for the purpose of identification. This "limited restriction of the personal mobility" (*People* v. *Manis, supra,* 268 Cal.App.2d 653, 663) of the occupants of the car was reasonable. In this area of the law each case must stand on its own facts. There are a number of cases allowing officers to stop for the purposes of inquiry (we interpolate and add, for the purpose of identification). An interesting list of these situations appears in *People* v. *Manis, supra,* at p. 664. (See also *People* v. *Failla,* 256 Cal.App.2d 869 [65 Cal.Rptr. 115]; *People* v. *Alvarado,* 250 Cal.App.2d 584 [58 Cal.Rptr. 822]; *People* v. *Perez,* 243 Cal.App.2d 528, 531 [52 Cal.Rptr. 514]; *People* v. *Cowman,* 223 Cal.App.2d 109 [35 Cal.Rptr. 528]; *People* v. *Gibson, supra,* 220 Cal.App.2d 15.)

The cases cited by petitioner are readily distinguishable.

In *People* v. *Franklin,* 261 Cal.App.2d 703 [68 Cal.Rptr. 231], it was held that the police officers had no authority to stop a car solely to investigate vehicle registration on the speculation by an officer that a car carrying out-of-state license plates had improper registration. There is nothing in the *Franklin* case to indicate that what the officers were doing was in the proper discharge of their duties. However, the case points out that had the officers been members of the highway patrol (who have the duty and authority to check the validity of vehicle registration), the stopping of the car might have been proper.

In *People* v. *Moore, supra,* 69 Cal.2d 674, detention was improper when the only basis for it was the nervousness of the defendant. In *People* v. *Escollias,* 264 Cal.App.2d 16 [70 Cal.Rptr. 65], a private citizen gave some nebulous information about the defendants carrying on a conversation and behaving in a way that might possibly be consistent with unlawful behavior. The court properly held that the officers had no right to detain for questioning.

In *People* v. *Hunt,* 250 Cal.App.2d 311 [58 Cal.Rptr. 385], the officer's reliance on a citizen's report that the defendant and a companion were "hanging around" and acting suspiciously was insufficient to justify temporary detention for questioning. In none of these cases can it be said that the

officers' actions were reasonable in the proper discharge of their duties.

Given a rational and reasonable suspicion that a wanted man is in a car, we can find nothing unreasonable in stopping that car to ascertain whether or not this is true. If this is a momentary inconvenience to the travelling public, it is a slight price to pay for the maintenance of an orderly society. Any other rule would seriously hamper law enforcement officers in the apprehension of those charged with crime. ▮ We conclude that the proper and salutary rule is as follows: When law enforcement officers have reasonable cause to arrest an individual *and* they have a rational suspicion that he may be in a motor vehicle, they have a right to stop that vehicle and identify the occupants therein.

Petition denied.

McCabe, P. J., and Kerrigan, J., concurred.