Filed 1/20/22  P. v. Mason CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C091905 |
| Plaintiff and Respondent, | (Super. Ct. No. 16F4750) |
| v. | |
| RONALD KAY MASON, | |
| Defendant and Appellant. | |

After the trial court denied defendant Ronald Kay Mason's motion to suppress his confession that he masturbated in his car and exposed himself to the victim, which he gave after being detained during a traffic stop, a jury found him guilty on two counts of indecent exposure with a prior sex offense.  Defendant appeals the trial court's denial of his suppression motion, arguing that the admission at trial of his confession violated his Fifth Amendment right against self-incrimination because he made the incriminating statement during a custodial interrogation without first being advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

1

We find no error and affirm.

BACKGROUND

While Julia C. (Julia) was loading groceries into her car on July 3, 2016, at a WinCo Foods in Redding, a white truck pulled into the spot next to the driver's side of her car. As she got into her car, she looked over at the white truck and saw the male driver lift his hips to show her that he was masturbating. Julia saw the driver moving his hand on his exposed penis. She looked over a second time and the driver did the same thing. Although the driver looked at her, Julia did not recall looking at his face. Julia pulled her car forward and called 911.[1] She circled around and pulled behind the truck as it drove away to obtain its license plate number before the driver pulled away.

Julia described the man's truck as a white Ford Ranger, and she provided the 911 dispatcher with a license plate number that started with the letter "B." Recognizing that California license plates typically start with a number rather than a letter, the responding officer changed the "B" to an "8" and searched a vehicle database; he received a match for a Ford pickup truck owned by defendant.

Two days later, defendant committed an identical offense. On July 5, 2016, Paula R. (Paula) returned to her car in the parking lot of a Walmart in Redding. Paula, who had red hair at the time, loaded items into her car and returned her shopping cart. As she walked back to her car, she noticed that a white Ford Ranger had taken the spot next to the driver's side of her car. As Paula got into her car, she saw movement in the truck. She turned and looked, and saw the male driver's pants were undone. His buttocks were lifted off the seat, and his hand was in his groin area. The driver appeared to be masturbating. She did not see the man's face and never saw him look at her during the incident.

---

[1] Julia's 911 call was played for the jury.

Paula pulled out of her parking spot and stopped behind some nearby cars to write down the truck's license plate number and call 911.[2]  The truck drove off, and Paula followed it, relaying to the 911 dispatcher a description of the truck, its license plate number, and its location.  While following the truck, Paula was able to observe the driver's face.[3]

Officer Devin Ketel responded to the 911 call and located a white truck that matched the description and license plate number Paula provided.  He stopped the truck on the Highway 44 westbound onramp; defendant was the driver and sole occupant of the truck.

Officer Ketel questioned defendant outside his truck, and he initially denied being in the Walmart parking lot earlier that day.  Defendant eventually admitted that he had seen a woman with red hair in the parking lot, and had masturbated in his truck and exposed himself to her for excitement.  During an in-field showup, Paula positively identified defendant.

Defendant was arrested and charged with two counts of indecent exposure with a prior conviction under Penal Code section 288, subdivision[4] (§ 314, subd. 1, count 1 [July 3 incident] & count 2 [July 5 incident]).  As to both counts, it was alleged that he had a prior strike conviction for a sexual offense.  (§ 1170.12.)

Defendant filed a motion in limine to exclude his confession from trial.  He contended that Officer Ketel violated his Fifth Amendment rights by subjecting him to a custodial interrogation during the traffic stop without first giving him *Miranda* warnings.

---

[2]     Paula's 911 call was played for the jury.

[3]     At trial, Paula identified defendant as the man she saw in the white truck.

[4]     Undesignated statutory references are to the Penal Code.

3

At a pretrial hearing on the motion, Officer Ketel testified that he pulled defendant over after someone called 911 to report seeing a man in a truck that matched defendant's vehicle masturbating and exposing himself in a Walmart parking lot. The reporting party followed defendant and reported his location to the dispatcher.

Officer Ketel activated the lights on his patrol vehicle when he pulled defendant over on the side of a highway onramp; he did not activate his sirens and never drew his gun on defendant. In a conversational tone, Officer Ketel asked defendant where he had been, where he was going, and whether he had been at the Walmart in Redding. Defendant denied being at the Walmart, but said he had been at the WinCo Foods and FoodMaxx parking lots.

Officer Ketel directed or ordered defendant to get out of his truck and to stand near the rear passenger side of the vehicle so they would be safe from the nearby roadway. Had defendant tried to leave, Officer Ketel would not have allowed him to do so, although he never told defendant that he was not free to leave. Once outside the vehicle, Officer Ketel patsearched defendant for weapons, which was "standard operating procedure" for conducting a contact outside a vehicle.

Shortly after Officer Ketel initiated the traffic stop, two additional uniformed officers arrived on the scene. They both observed the questioning from about eight to ten feet away, but neither officer spoke with defendant.

Officer Ketel continued to ask defendant why the police had been called regarding his vehicle at the Walmart. Officer Ketel told defendant that there was likely surveillance video of what allegedly occurred in the parking lot. Defendant, however, continued to deny being at the Walmart.

During the interaction, Office Ketel stood between three and six feet away from defendant, who was able to move freely. In fact, at one point during the conversation, defendant, who appeared "very relaxed and . . . comfortable," moved towards Officer Ketel's patrol car and tried to lean or sit on the hood of the car; Officer Ketel yelled at

4

him to "[g]et off my car. Don't lean on my car," because he did not want defendant to damage the car's hood. Officer Ketel characterized his statement to defendant as an order. Defendant complied.

Defendant eventually admitted being at Walmart. Defendant told Officer Ketel that he had seen a woman with red hair that he found attractive, and that he masturbated and exposed his penis to her when she walked by. The woman flipped him off and drove away. Defendant also stated that he was a sex offender, and that what occurred at the Walmart parking lot could put him in prison, as he had a 16-year lid based on his prior criminal history.

After defendant made the incriminating statements, Officer Ketel handcuffed him and placed him under arrest. Approximately 33 minutes had passed from when Officer Ketel received the dispatch call and when he arrested defendant; the officer estimated that it took him less than 10 minutes to locate defendant after initially receiving the dispatch.

Officer Ketel transported defendant to the Shasta County Jail and did not ask him any questions because he had not yet given defendant *Miranda* warnings. During the drive, defendant spontaneously stated that he should not have passed or completed the sex offender program he was required to take. When they arrived at the jail, Officer Ketel read defendant his *Miranda* rights.

After considering the evidence, as well as Officer Ketel's testimony during the preliminary hearing, the trial court denied defendant's motion to suppress.[5] The court found that defendant had not been subjected to a custodial interrogation during the traffic stop. In so finding, the court noted that defendant was stopped and questioned on a busy,

---

[5]    The magistrate had previously denied, without prejudice, defendant's motion at the preliminary hearing to suppress his statements to Officer Ketel. At the subsequent hearing on defendant's motion to suppress before trial, the court granted defendant's request to consider the preliminary hearing transcript. Officer Ketel testified similarly during the preliminary hearing.

public roadway. Although three officers were technically present, only Officer Ketel questioned defendant, and his demeanor was polite and conversational. The court further noted that defendant was not formally arrested, he was not restrained or placed in handcuffs, and the responding officers did not draw their weapons. Defendant also felt free enough to move around and attempt to sit on the officer's patrol car during the interview. The fact that Officer Ketel yelled at defendant to get off the patrol car did not turn the encounter into a custodial interrogation.

The court admitted defendant's confession during trial, and the jury found defendant guilty on both counts.[6] In a bifurcated proceeding, the court found the prior strike allegation true. After declining to strike defendant's strike prior, the court sentenced him to an aggregate term of five years four months in prison. Defendant timely appealed.[7]

DISCUSSION

Defendant contends the trial court erred prejudicially in denying his motion to suppress his roadside confession because it was obtained in violation of *Miranda*. The

---

[6] Citing Evidence Code section 352, the trial court granted defendant's motion to exclude his prior section 288, subdivision (a) conviction under Evidence Code section 1108, as well as his statements during the traffic stop that he was a section 290 registrant, that he was on probation, that he had a 16-year lid, and that he should not have passed the sex offender treatment program.

[7] Defendant's appeal, which trial counsel filed on May 5, 2020, actually was filed one week late. Defendant was sentenced on February 28, 2020, as the abstract of judgment clearly stated, but trial counsel apparently believed the 60-day appeal deadline (Cal. Rules of Court, rule 8.308(a)) ran from April 30, 2020, which is the date the abstract of judgment was filed. We deem defendant's notice of appeal to have been timely under the constructive filing doctrine. (See *In re Benoit* (1973) 10 Cal.3d 72, 85-89 [constructive filing doctrine applies to prisoner who relied on attorney to file notice of appeal].)

6

alleged error, he argues, was not harmless beyond a reasonable doubt, thereby requiring reversal for a new trial.

I

Miranda *Advisements*

No person in a criminal case may be compelled to be a witness against himself. (U.S. Const., 5th Amend.)  In *Miranda*, the United States Supreme Court held that a person questioned by the police after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  (*Miranda, supra*, 384 U.S. at p. 444.)  Statements obtained in violation of this rule cannot be used to establish guilt at trial.  (*Ibid.*)

*Miranda* advisements are required only when a person is subjected to "custodial interrogation."  (*Miranda, supra*, 384 U.S. at p. 444; *People v. Mickey* (1991) 54 Cal.3d 612, 648.)  "Custodial" means "any situation in which 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " (*Mickey, supra*, at p. 648.)  Interrogation " 'refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.' "  (*Ibid*.)

On appeal, we accept the trial court's findings of historical fact if supported by substantial evidence but independently determine whether the interrogation was " 'custodial.' "  (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1161-1162 (*Aguilera*).)  "We accept factual inferences in favor of the judgment or order below, even when we must independently review the legal conclusion the trial court has drawn.  [Citations.]" (*People v. Stansbury* (1995) 9 Cal.4th 824, 831.)

## II

### *Custodial Interrogation*

The parties agree that the primary issue here is whether defendant was in custody when he made the incriminating statements. Defendant argues that Officer Ketel interrogated him under circumstances tantamount to a formal arrest. He notes that Officer Ketel initiated the interview during which he used accusatory and confrontational police questioning to get defendant to confess, that his freedom of movement during the encounter was severely restrained since he was ordered out of his car, yelled at not to sit on the hood of the officer's patrol car, and three officers were present, blocking him from leaving.

The People, on the other hand, argue the *Miranda* requirements did not apply because the officer's polite questioning during a daytime traffic stop along a busy public roadway did not constitute a custodial interrogation. And, in any event, they argue any error was harmless beyond a reasonable doubt given the other evidence of defendant's guilt. We agree with the People.

Whether a person is in "custody" depends on the circumstances surrounding an interrogation. (*Aguilera, supra*, 51 Cal.App.4th at p. 1161.) The circumstances are then measured against an objective, legal standard: "[W]ould a reasonable person in the suspect's position during the interrogation experience a restraint on his or her freedom of movement to the degree normally associated with a formal arrest." (*Ibid*.; *Berkemer v. McCarty* (1984) 468 U.S. 420, 442 [82 L.Ed.2d 317, 336] (*Berkemer*).)

Several factors, none of which are dispositive, inform our "custody" analysis. (*Aguilera, supra*, 51 Cal.App.4th at p. 1162.) Such factors include whether the contact was initiated by the police or the person interrogated and, if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he was under arrest or in custody; whether they

8

informed the person that he was free to end the interview and leave at any time, and whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether the officers dominated or controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation. (*Ibid.*; see also *People v. Stansbury, supra*, 9 Cal.4th at pp. 831-832.)

After considering the totality of the circumstances, we cannot say the trial court erred in finding that defendant was not in "custody" when Officer Ketel questioned him during the traffic stop. While it is true that Officer Ketel initiated the encounter with defendant by pulling him over after he observed defendant driving a truck matching the eyewitness's description, in general, a person detained pursuant to a traffic stop is not in custody for *Miranda* purposes. (*Berkemer, supra*, 468 U.S. at p. 440.) Although a traffic stop "significantly curtails the 'freedom of action' of the driver" of the detained vehicle (*id*. at p. 436), because a traffic stop is relatively short and typically conducted in public, the safeguards of *Miranda* do not normally apply until "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' " (*Id*. at pp. 440, see also *id*. at pp. 438, 441-442.)

In this case, defendant was detained for a relatively short period of time, only around 20 minutes, before he was formally arrested. That limited amount of time is not akin to prolonged police questioning.

The evidence, moreover, showed that Officer Ketel spoke with defendant in a relaxed and conversational tone during the encounter.

And while three officers were present during the traffic stop, only Officer Ketel questioned or spoke with defendant. The other two officers did not engage defendant at

9

all. We do not believe the nearby presence of these additional officers elevated the encounter to a custodial interrogation.

Nor were *Miranda* warnings required simply because Officer Ketel suspected defendant of the alleged crime. (*Stansbury v. California* (1994) 511 U.S. 318, 324 [128 L.Ed.2d 293, 299].) "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." (*Id*. at p. 323.)

And while defendant's movements during the traffic stop were somewhat curtailed, they were not hindered any more than during a routine traffic stop. (*Berkemer, supra*, 468 U.S. at p. 436 [recognizing routine traffic stop curtails driver's freedom of action].) That type of restraint, in a public setting, ordinarily does not rise to the level of custody warranting *Miranda* warnings. (*Id*. at pp. 437-439 [traffic stop exposed to public view reduces ability to elicit self-incriminating statements and diminishes motorist's fear that he will be subjected to abuse if he fails to cooperate].) As the trial court noted, defendant appeared so relaxed during the encounter that he tried to sit on Officer Ketel's patrol car.

The traffic stop in this case was more akin to a " 'Terry stop' " rather than a formal arrest. (*Berkemer, supra*, 468 U.S. at p. 439; *Terry v. Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889].) Because Officer Ketel reasonably detained defendant in response to the report he received from dispatch based on the eyewitness's report, he was entitled to " 'investigate the circumstances that provoke[d] suspicion.' " (*Berkemer*, at p. 439.) These circumstances included defendant's location in an area where the driver of a truck matching the one he was driving was seen masturbating in front of the victim. Furthermore, Officer Ketel was permitted to ask defendant "a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." (*Ibid*.; *People v. Manis* (1969) 268 Cal.App.2d 653, 663 ["brief questioning of a suspect temporarily detained by the police for investigation

10

is constitutionally valid"].)  Before doing so, he was not required to inform defendant of his *Miranda* rights.  (*Manis, supra*, at p. 669 ["persons temporarily detained for brief questioning by police officers who lack probable cause to make an arrest or bring an accusation need not be warned about incrimination and their right to counsel, until such time as the point of arrest or accusation has been reached or the questioning has ceased to be brief and casual and become sustained and coercive"].)

DISPOSITION

The judgment is affirmed.


        KRAUSE        , J.


We concur:


        RAYE        , P. J.


        MAURO        , J.


11